**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GABRIEL FRANCIS TORO, | |
| Plaintiff, | Civil Action No. 20-2282 (CPO) (AMD) |
| v. | |
| DR. JEFFREY ASAO, et al., | **OPINION** |
| Defendants. | |

**O'HEARN, District Judge.**

Before the Court are Defendants' motion for summary judgment (ECF No. 93), and Plaintiff's cross-motion for summary judgment, (ECF No. 99, 100), both pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court will grant Defendants' motion for summary judgment and deny Plaintiff's cross-motion.

## I.   FACTUAL BACKGROUND[1]

This case arises from an assault during Plaintiff's incarceration at Federal Correctional Institution Fort Dix. As the parties are intimately familiar with the facts of this case, and because the Court has already set forth the background of this matter in an earlier Opinion, (ECF No. 34), the Court will only state those facts necessary to address the instant motions. The remaining Defendants are Dr. Jeffrey Asao, Dr. Nicoletta Turner-Foster, Dr. Bill Bucur, Warden David Ortiz, Associate Warden Charles Smith, Correctional Counselor Charles Lee, and Case Manager Lekeith Moore. (*See* ECF Nos. 35, 88, 89.)

---

[1] As the Court will first address Defendants' motion, the Court construes all facts and draws all reasonable inferences in the light most favorable to Plaintiff. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

On March 8, 2018, at around 12:45 a.m., several inmates brutally assaulted Plaintiff. (ECF No. 100-1, ¶¶ 1–4.) The inmates punched Plaintiff in the face several times, bound his arms and legs, and then repeatedly slammed his face against the floor "like . . a human pinata." (*Id*. ¶ 4.) Following the assault, Plaintiff's face and mouth were bruised, swollen, and bloodied, and he was slurring his speech. (*Id*. ¶ 6.) After the attackers forced him to shower and clean the blood, Plaintiff made himself an ice pack and tried to sleep. (*Id*. ¶ 7.)

Later that morning, Defendants Moore and Lee visited Plaintiff's room for "morning inspection." (*Id*. ¶ 8.) Plaintiff, with slurred speech, spoke with these Defendants, who were able to see his bruised and swollen face "basically at eye level," "within 2 to 3 feet" with a make-shift ice pack and "bloody drool on [his] pillow." (*Id*. ¶¶ 6, 9.) Defendants Moore and Lee did not offer to assist or investigate the cause of Plaintiff's injuries. (*Id*. ¶ 10.)

The next day, on Friday, March 9, 2018, at 6:30 a.m., Plaintiff sought medical treatment at "sick call" and told medical staff that he was injured playing basketball, fearing retaliation if he had told the truth. (*Id*. ¶¶ 12–13.) Suspicious of his story, staff sent Plaintiff to a Lieutenant's office, and then the medical department, to better assess his injuries. (*Id*. ¶ 14.)

At medical, Defendant Asao, a dentist at Fort Dix, examined Plaintiff. (*Id*. ¶ 15.) Defendant Asao identified Plaintiff's pain as an eight out of ten, and even without radiography, was able to determine that Plaintiff suffered a "[c]lear, demarcated" jaw fracture. (*Id*. ¶ 17.) Defendant Asao recommended sending Plaintiff to the emergency room and that an evaluation should be scheduled with an oral surgeon. (*Id*. ¶¶ 17–18.)

Later that day, Plaintiff arrived at Robert Wood Johnson's ("RWJ") emergency room, and doctors "diagnosed him with an acute bilateral jaw fracture." (*Id*. ¶ 20.) RWJ staff advised that Plaintiff required immediate surgery to repair his broken jaw and discussed the issue with a

2

"[d]octor at Fort Dix," and with Dr. Focarile, a private oral and maxillofacial surgeon who was contracted to work with Fort Dix. (*Id.*)  Dr. Focarile told Defendant Asao that Plaintiff needed to be seen "right after the weekend," "as soon as possible," and that Dr. Focarile would "make room for him and treat him on an emergent basis."  (*Id*. ¶¶ 25–27.)  Later that same day, Plaintiff was discharged and upon his return to Fort Dix, he was placed in the Special Housing Unit ("SHU"), *i.e.*, solitary confinement, pending an investigation. (*Id*. ¶ 29.)

On Monday, March 12, 2018, Defendant Bucur entered a BOP consultation request, requesting oral surgery for Plaintiff, labeling the priority "Urgent" as opposed to "Emergent," and the level of care as "Medically Necessary—Acute or Emergent." (*Id*. ¶¶ 36–37.)  He also set the target date for the surgery as Friday, March 16, but the BOP did not mention this to Dr. Focarile. (*Id*. ¶¶ 38–39.)

After Plaintiff did not appear for surgery on March 12th, Dr. Focarile called Defendant Asao and advised that he would need to perform surgery that week, because he was going on vacation the following week, and would not return until March 26, 2018. (*Id*. ¶ 31.)  Dr. Focarile reiterated that Plaintiff required "emergent treatment . . . before [he] gets infected or he starts forming a bony callus," after which, he "would not be able to . . . treat [Plaintiff] appropriately in an office setting." (*Id*. ¶ 32.)

Dr. Focarile opined that the case was "emergent" because Plaintiff suffered an open, displaced fracture, and required corrective surgery within three to four days, at most, to prevent a serious bone infection and other potentially permanent injuries. (*Id*. ¶ 33.)  Dr. Focarile's office repeatedly "called the prison to jostle them into" scheduling the surgery any day during the week of March 12th. (*Id*. ¶ 35, 39.)

After realizing that Plaintiff was not going to appear for surgery that week, Dr. Focarile contacted Defendant Asao on Friday, March 16th, and left a message regarding Plaintiff's care. (*Id.* ¶ 46.) On March 19th, Defendant Asao entered a note, stating that Plaintiff's surgery would be scheduled for March 26, 2018, when Dr. Focarile returned from vacation. (*Id.* ¶ 47.) Defendants did not attempt to schedule Plaintiff's surgery with any other surgeons. (*Id.* ¶ 48.)

While awaiting surgery, Plaintiff experienced the "most pain [he] had ever felt." (*Id.* ¶ 52.) Although Dr. Focarile and RWJ staff prescribed Tylenol with codeine every six hours and Children's Ibuprofen every eight hours, Defendant Turner-Foster ignored those instructions and requested that Plaintiff receive those medications only twice per day. (*Id.* ¶¶ 53–54.) During this waiting period, between March 9th and March 26th Defendants Ortiz and Smith toured the SHU and saw Plaintiff's physical state. (*Id.* at ¶ 57.) Throughout that time, Plaintiff was wrapped in a Barton bandage, *i.e.*, a bandage wrapped around the head designed to support the jaw. (*Id.* ¶ 23.)

On March 26, 2018, two weeks after his recommended surgery date, Plaintiff underwent surgery with Dr. Focarile, who corrected his jaw and wired it shut. (*Id.* ¶ 58.) Dr. Focarile emphasized the delay and noted that "the outcome may not be typical due to the delay in treatment." (*Id.* ¶ 59.) The delay also required Dr. Focarile to perform a more invasive procedure, as he had to remove bone healing calluses, which would not have occurred if Plaintiff had received immediate corrective surgery. (*Id.* ¶¶ 62–64.) Dr. Focarile opined that there was a "good possibility of permanent numbness," "possible non-union due to delay in [treatment]," "possible less than perfect reduction due to delay in treatment," and "possible infection" because Plaintiff had "not been on [antibiotics]" as prescribed, "which could . . . complicate healing." (*Id.* ¶ 61.)

In the five years after he received surgery, Plaintiff "reported numbness in his lip and chin area, intermittent discomfort with chewing, a snap on his jaw when opening and closing his mouth,

uneven bite, an uncomfortable clicking sensation, . . . difficulty eating without biting himself," and required Ibuprofen for pain while eating through at least March 6, 2023. (*Id*. ¶¶ 69–72.)

## II. PROCEDURAL HISTORY

Plaintiff initiated this action *pro se* in March of 2020 and filed the operative Complaint with appointed counsel in April of 2021.[2] (ECF No. 9.) The Amended Complaint asserts the following claims: Violation of Plaintiff's Eighth Amendment Rights for Failure to Provide Medical Treatment under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) (Count I); Violation of Plaintiff's Eighth Amendment Rights for Failure to Protect Plaintiff (Count II); and Federal Tort Claims Act Medical Malpractice (Counts III and IV).

On October 25, 2022, the Court granted in part a motion to dismiss, and dismissed Plaintiff's Federal Tort Claims Act claims (stemming from medical malpractice allegations in Counts III and IV), as well as all claims against Defendants Cabanas and Gomez. (ECF No. 35.) After discovery, Plaintiff voluntarily dismissed Count II, his failure to protect claims, as well as his claims against former Defendant Rangone. (ECF Nos. 88, 89.)  Thus, Count I is the only remaining count, which alleges that the remaining Defendants failed to provide adequate medical care in violation of Plaintiff's Eighth Amendment rights. (ECF No. 9, ¶¶ 43–54.)

Defendants filed the instant motion for summary judgment, (ECF No. 93), and Plaintiff filed an opposition and cross-motion for summary judgment, (ECF No. 99, 100). Defendants filed a reply and cross-motion opposition, (ECF No. 107), and Plaintiff filed a sur-reply and cross-motion reply, (ECF No. 111.)

---

[2] The Court is appreciative of the efforts of appointed counsel for the zealous representation on behalf of Plaintiff.

### III. STANDARD OF REVIEW

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton,* 572 U.S. 650, 656–57 (2014). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Cotton,* 572 U.S. at 657. The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof," the moving party may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 248 (1986); *see generally* Fed. R. Civ. P. 56(c) (setting forth types of evidence that may show that genuine issues of material fact exist). The non-moving party must at least present probative evidence from which the jury might return a verdict in his favor. *Anderson*, 477 U.S. at 257. Where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 322.

### IV. DISCUSSION

Plaintiff brings his remaining claims pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff alleges that Defendants denied or delayed medical care in violation of his rights under the Eighth Amendment. (ECF No. 9, ¶¶ 55–

63.) Defendants move for summary judgment, arguing among other things, that Plaintiff can no longer pursue a *Bivens* remedy in light of *Ziglar v. Abbasi*, 582 U.S. 120 (2017), and its progeny. As both parties have moved for summary judgment, all parties concede there are no disputed facts and that the remaining issues present only questions of law for the Court.

### A. Current State of *Bivens*

In *Bivens*, the Supreme Court created an implied cause of action under the Fourth Amendment, "against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." *Egbert v. Boule*, 596 U.S. 482, 490 (2022) (quoting *Bivens*, 403 U.S. at 397). The Court extended the *Bivens* remedy twice more in *Davis v. Passman*, 442 U.S. 228 (1979) (holding that a *Bivens* remedy exists for a Fifth Amendment gender discrimination claim where a congressman fired an administrative assistant), and *Carlson v. Green*, 446 U.S. 14 (1980) (holding that a prisoner's estate had a *Bivens* remedy under the Eighth Amendment against prison officials for failing to treat the prisoner's asthma which resulted in his death). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 582 U.S. at 131.

After more than fifty years of *Bivens* jurisprudence, "the Supreme Court . . . pulled back the reins to . . . a full stop." *Xi v. Haugen*, 68 F.4th 824, 832 (3d Cir. 2023). In *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017), the Supreme Court announced, "that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." The Court held that if "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," a court "must refrain from creating it." *Egbert*, 596 U.S. at 491 (quoting *Ziglar*, 582 U. S. at 137). "Even a single sound reason to defer to Congress is enough to *require* a court to refrain from creating such a remedy."

*Id*. (emphasis added) (internal quotation marks omitted).  Stated differently, "if there is a rational reason to think" that Congress, rather than the courts, "should decide whether to provide . . . a damages remedy, . . . . no *Bivens* action may lie." *Id*. at 492.  The Court warned that Congress should make that decision "in [al]most every case." *Id*.

As a result, when faced with a proposed *Bivens* claim, courts should now engage in a two-step inquiry. *Id*.; *Xi*, 68 F.4th at 833.  First, the court asks, "whether the case presents a new *Bivens* context," *i.e.*, whether the case is "meaningfully different" from *Bivens*, *Davis*, and *Carlson*. *Egbert*, 596 U.S. at 492; *Xi*, 68 F.4th at 833.  "If a case does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available." *Shorter v. United States*, 12 F.4th 366, 372 (3d Cir. 2021).

If the claim does arise in a new context, a court should proceed to the second step and ask whether any "special factors" warrant hesitation in extending a *Bivens* remedy to the claim. *Egbert*, 596 U.S. at 492; *Xi*, 68 F.4th at 833.  The Supreme Court defined a "special factor" as one that suggests that Congress is better suited than the judiciary to "weigh the costs and benefits" of creating a new remedy for monetary damages. *Egbert*, 596 U.S. at 492; *Xi*, 68 F.4th at 833.  The test is incredibly stringent, "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Egbert*, 596 U.S. at 492 (quoting *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020)); *Xi*, 68 F.4th at 836.

### B. New Context

When deciding whether a claim presents a new context, the Supreme Court has "made clear that the category of 'new contexts' is 'broad,' and [that] this threshold test is 'easily satisfied.'" *Xi*, 68 F.4th at 834 (quoting *Hernandez*, 589 U.S. at 102; *Ziglar*, 582 U.S. at 139); *Bulger v. Hurwitz*, 62 F.4th 127, 138 (4th Cir. 2023) ("[C]ourts should not interpret *Carlson* to apply outside

the precise context at issue in that case, . . . even claims challenging the adequacy of medical care [that] involve the same right and . . . mechanism of injury . . . [may] still present different contexts.") (internal quotation marks omitted); *see also Mays v. Smith*, 70 F.4th 198, 203 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 1008 (2024) ("This [step] is a low bar because even 'quite minor' differences . . . can amount to a new context."). Thus, even if a case presents "almost parallel circumstances or a similar mechanism of injury," such "superficial similarities are not enough." *Egbert*, 596 U.S. at 495 (internal quotation marks omitted); *Mays*, 70 F.4th at 204; *Xi*, 68 F.4th at 834.

To determine whether a claim might differ in a "meaningful way," the Supreme Court suggested that these differences might concern:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 582 U.S. at 139–40. The Court emphasized that this was not an exhaustive list, but merely a few examples. *Id*. at 139.

In the present case, Plaintiff argues that his claims do not present a new context because his case is sufficiently similar to *Carlson*. (ECF No. 100, at 39–44.) The Court disagrees. In *Carlson*, federal prison officials housed a prisoner with severe asthma, at a location with grossly inadequate medical facilities, against the advice of the prisoner's doctors. *Carlson*, 446 U.S. at 16 n.1. The prisoner had an asthma attack and did not receive competent care for approximately eight hours. *Id*. Staff then "administered contra-indicated drugs which made his attack more severe,

9

attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long . . . his transfer to an outside hospital," resulting in his death. *Id.*

This case presents many distinctions from *Carlson*. First and foremost, the emergency in *Carlson* resulted in death. *Id.* While the Court does not minimize Plaintiff's injuries, his ordeal, while harrowing, was not fatal. Nor does Plaintiff allege that his jaw fractures were life-threatening. (*See generally* ECF No. 9; ECF No. 100.) Courts around the country have found that variances in severity can render claims meaningfully different from *Carlson*. *See, e.g.*, *Yaeger v. Song*, No. 22-05056, 2024 WL 3064673, at *3 (D.N.J. June 20, 2024); *Spivey v. Breckon*, No. 20-00400, 2024 WL 1184445, at *7 (W.D. Va. Mar. 18, 2024) (collecting cases); *Bettis v. Grijalva*, No. 21-7505, 2023 WL 4141869, at *6 (S.D.N.Y. June 23, 2023) (collecting cases); *Muniz v. United States*, No. 22-0816, 2023 WL 8469510, at *5 (D.N.J. Dec. 7, 2023).

While death is not necessarily required, there is a growing consensus that the risk must involve at least a "life threatening" denial of care to be sufficiently similar to *Carlson*. *See, e.g.*, *Yaeger*, 2024 WL 3064673, at *3 (finding that a delay in removing a tooth that was causing "extreme pain," was a new context because the denial of care was not life threatening); *Ortiz v. United States*, No. 23-203, 2024 WL 1620790, at *6, 12 (M.D. Pa. Apr. 15, 2024) (holding that a delay in removing a painful, "20cm x 12cm" benign neck tumor was a new context in part because the denial of care was not life threatening); *Muniz*, 2023 WL 8469510, at *4 (finding that failing to treat a diabetic ulcer that resulted in amputation of a toe was a new context because the denial of care was not life threatening); *Bettis*, 2023 WL 4141869, at *6 (concluding that a delay in treatment following a brutal assault that resulted in weeks of bloody urine and swollen bruised testicles was a new context because the denial of care was not life threatening); *Sharp v. United States Marshals Serv.*, No. 20-03282, 2022 WL 3573860, at *7 (E.D.N.C. July 15, 2022) (finding

10

that severe pain from "infected and bleeding gums, and a tooth breaking into pieces" was "vastly different" from the fatal injury in *Carlson*); *Edwards v. Gizzi*, No. 20-7371, 2022 WL 309393, at *7 (S.D.N.Y. Feb. 2, 2022) (holding that failing to treat a broken arm is "clearly and meaningfully different from a failure to provide life-saving medical care to an inmate"); *see also Holton v. Finley*, No. 21-737, 2024 WL 1919238, at *9 n.44 (M.D. Pa. Mar. 21, 2024) (collecting cases); *Feao v. Ponce*, 2023 WL 3213553, at *13 (C.D. Cal. Mar. 3, 2023) ("long-term mismanagement of a serious condition, resulting in an inmate's death" was not "meaningfully different" from *Carlson*).

The life-threatening distinction "is significant for multiple reasons, including that administrative and injunctive relief would have a completely different application . . . than to the claims in *Carlson*." *Yaeger*, 2024 WL 3064673, at *3; *Muniz*, 2023 WL 8469510, at *5. In *Carlson*, the prisoner did not have the time or ability to pursue administrative or injunctive relief, and the Supreme Court "fashioned a *Bivens*-type remedy" for the prisoner's estate, "to make right a grave constitutional wrong." *Washington v. Fed. Bureau of Prisons*, No. 16-3913, 2022 WL 3701577, at *5 (D.S.C. Aug. 26, 2022). In contrast, Plaintiff could have sought administrative or injunctive relief to address his delayed surgery. The availability and feasibility of such remedies in this case are themselves meaningful differences from *Carlson*. *See Dongarra v. Smith*, 27 F.4th 174, 180 (3d Cir. 2022) (explaining post-*Ziglar*, that a prisoner's ability to pursue administrative or injunctive relief is a meaningful distinction); *Yaeger*, 2024 WL 3064673, at *3; *Holton*, 2024 WL 1919238, at *9; *Muniz*, 2023 WL 8469510, at *5. *Washington*, 2022 WL 3701577, at *5.

Next, *Carlson* involved the total absence of competent medical care. *Carlson*, 446 U.S. at 16 n.1. In contrast, Plaintiff received medical care as soon as he reported his injuries. (ECF No. 100-1, ¶¶ 12–20.) Staff treated him at the prison's medical department and then transported him

11

to an emergency room where he received additional treatment. (*Id*. ¶¶ 15–27.) After returning to prison, he received at least some of the pain medication prescribed to him, even if he did not receive it at the frequency the doctor had prescribed. (*Id*. ¶¶ 53–54.) Finally, although he had to wait seventeen days in severe pain, he did eventually undergo surgery that was generally successful. (*Id*. ¶ 58, 68.) Plaintiff's receipt of medical care albeit delayed is a meaningful difference from *Carlson*. *See, e.g.*, *Ortiz*, 2024 WL 1620790, at *12; *Bettis*, 2023 WL 4141869, at *6 (finding that the plaintiff's "eventual receipt of medical care presents a context different from *Carlson*").

In his opposition, Plaintiff cites to *Bistrian v. Levi*, 912 F.3d 79, 90 (3d Cir. 2018), and *Shorter v. United States*, 12 F.4th 366, 372 (3d Cir. 2021), and argues that "[i]f a failure-to-protect claim—which has nothing to do with providing [medical] care . . . did not present a new context [from *Carlson*], surely" Plaintiff's case is not a new context. (ECF No. 100, at 37.) Plaintiff's arguments are misplaced.

In *Bistrian*, the Third Circuit held that the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994), remains good law post-*Ziglar*. *Bistrian*, 912 F.3d at 90–91 (citing *Farmer*, 511 U.S. at 832–49.) In *Farmer*, the Supreme Court vacated summary judgment and discussed the deliberate indifference standard to apply to Eighth Amendment failure to protect claims regarding "prisoner-on prisoner violence." *Id.* However, the Court "did not explicitly state that it was recognizing a *Bivens* claim" for failure to protect under the Eighth Amendment. *Id.*

In *Ziglar*, the Supreme Court did not identify *Farmer* as one of the three implied remedy *Bivens* cases. *Id.* at 91; *Ziglar*, 582 U.S. at 131. The Third Circuit has opined that the Supreme Court may have omitted *Farmer* because it viewed a "failure-to-protect claim as not distinct from [*Carlson's*] Eighth Amendment deliberate indifference claim in the medical context." *Bistrian*,

12

912 F.3d at 91.  Essentially, the Third Circuit held that *Farmer* is a fourth implied remedy case, and that courts can measure proposed failure to protect claims against *Farmer* to determine if they present a new context. *See id.* at 91–92; *see also Shorter*, 12 F.4th at 372–73.  In *Shorter*, the Third Circuit applied *Bistrian* and confirmed that *Farmer* remains good law. *Shorter*, 12 F.4th at 373.

Consequently, *Bistrian* and *Shorter* do not stand for the proposition that *all* Eighth Amendment cases of sufficient seriousness fall under *Carlson*, as Plaintiff suggests. (*See* ECF No. 100, at 37–38.)  Plaintiff ignores the Supreme Court's warnings that its definition of "new contexts" is extremely broad. *See Hernandez*, 589 U.S. at 102; *Ziglar*, 582 U.S. at 139–40.

For the reasons above, the Court finds that Plaintiff's case is meaningfully different from *Carlson* and presents a new *Bivens* context.  *See Egbert*, 596 U.S. at 495 (emphasizing that "almost parallel circumstances" or "superficial similarities are not enough").

### C. Special Factors

As this case presents a new *Bivens* context, the Court must proceed to the second step and determine whether any "special factors" warrant hesitation in extending a *Bivens* remedy to Plaintiff's claims. *Egbert*, 596 U.S. at 492; *Xi*, 68 F.4th at 833.  Once again, a "special factor" is one that suggests that Congress is better suited than the judiciary to "weigh the costs and benefits" of creating a new remedy for monetary damages. *See Egbert*, 596 U.S. at 492.  If "there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed," a court cannot imply a cause of action under *Bivens*. *Id*. at 496 (emphasis in original) (internal quotation marks omitted); *Xi*, 68 F.4th at 836.

Here, as "in [al]most every case," a number of special factors weigh against creating a *Bivens* remedy. *See Egbert*, 596 U.S. at 492.  First, the Supreme Court held in *Egbert* that "a court may not fashion a *Bivens* remedy if Congress . . . has provided, or has authorized the Executive

13

to provide, 'an alternative remedial structure.'" *Id*. at 493 (quoting *Ziglar*, 582 U.S. at 137).  The Supreme Court held that the BOP's administrative remedy program is a sufficient "alternative remedial structure" to constitute a special factor. *See id.* at 497 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)); *Bulger*, 62 F.4th at 140–41; *Silva v. United States*, 45 F.4th 1134, 1141 (10th Cir. 2022).

Since the BOP's administrative remedy program is an "alternative remedial structure" that was available to Plaintiff, "that alone, like any special factor, is reason enough to . . . [preclude] a new *Bivens* cause of action." *Egbert*, 596 U.S. at 493; *Bulger*, 62 F.4th at 140–41; *Marquez v. C. Rodriguez*, 81 F.4th 1027, 1033 (9th Cir. 2023); *Silva*, 45 F.4th at 1141; *Dongarra*, 27 F.4th at 181; *Yaeger*, 2024 WL 3064673, at *4.  "It is irrelevant that monetary damages are not available through the . . . program." *Yaeger*, 2024 WL 3064673, at *4; *see also Egbert*, 596 U.S. at 493 (holding that it does not matter that "existing remedies do not provide complete relief").

Nor does it matter that the alternative does not "afford rights to participation or appeal," because "the focus [of *Bivens* was] whether the Government has put in place safeguards to prevent constitutional violations from recurring." *Egbert*, 596 U.S. at 497–98.  "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy," even if those alternatives "are not as effective as an individual damages remedy." *Id*. at 498 (internal quotation marks omitted).

While the Court is cognizant of the practical difficulties, Plaintiff could have filed an administrative remedy regarding his medical care, which could have spurred the BOP to act. *See* 28 C.F.R. §§ 542.13, 542.13 (outlining the procedures for filing an administrative remedy at the staff and warden levels).  Accordingly, the existence of the BOP's administrative remedy program

14

is a special factor that cautions against implying a *Bivens* remedy. *See Egbert*, 596 U.S. at 493; *Dongarra*, 27 F.4th at 181.

Second, Plaintiff had another avenue for relief, "a federal injunction." *Dongarra*, 27 F.4th at 181. Like *Dongarra*, Plaintiff "could have asked a court for an injunction ordering the prison to fix its mistake," *i.e.*, compelled the BOP to schedule his surgery or provide him with better medical care. *Id*. The availability of such injunctive relief is another special factor. *See id*.; *Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019); *Caraballo v. Pliler*, No. 21-10476, 2023 WL 3467185, at *8 (S.D.N.Y. May 15, 2023); *see generally Malesko*, 534 U.S. at 74 ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.")

Next, the availability of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, is a special factor in cases, like this one, that involve inadequate medical care. *See, e.g.*, *Bettis*, 2023 WL 4141869, at *7 (collecting cases); *Swinton v. Serdula*, 2022 WL 3701196, at *7 (W.D.N.Y. Aug. 26, 2022); *Huckaby v. Bradley*, 2018 WL 2002790, at *6 (D.N.J. Apr. 30, 2018). Although "constitutional torts are not cognizable under the FTCA," had Plaintiff perfected his FTCA claims,[3] he could have sought damages for his injuries under state law tort theories, such as negligence or medical malpractice. *See, e.g.*, *Zierke v. United States*, 679 F. App'x 103, 106 (3d Cir. 2017); *see also F.D.I.C. v. Meyer*, 510 U.S. 471, 477–78 (1994). "While the named defendants, and the legal bases, are different, the factual bases are the same, as is the nature of the request for relief: damages." *Huckaby*, 2018 WL 2002790, at *6; *see also Swinton*, 2022 WL 3701196, at *7.

---

[3] The Court previously dismissed Plaintiff's FTCA claims because he did not name the proper party and failed to exhaust his administrative remedies prior to initiating suit. (ECF No. 34, at 6–8.)

15

Finally, the passage of the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104–134 (April 26, 1996), is another special factor. Approximately fifteen years "after *Carlson* was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Ziglar*, 582 U.S. at 148. Congress had the "specific occasion to consider the matter of prisoner abuse and . . . [how] to remedy those wrongs," but chose "not [to] provide . . . a standalone damages remedy against federal jailers." *See id.* at 148–49. That legislative action "suggest[s] that Congress does not want a damages remedy," and "is . . . a factor" that cautions against implying a *Bivens* remedy. *Id*. at 148; *Davis v. Samuels*, 962 F.3d 105, 113 n.5 (3d Cir. 2020); *Bettis*, 2023 WL 4141869, at *7 (collecting cases).

In sum, this case presents a new *Bivens* context, and although one was sufficient, multiple special factors caution against extending a *Bivens* remedy. *See Egbert*, 596 U.S. at 496. As a result, the Court will not imply a *Bivens* remedy. Accordingly, even assuming that Defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Eighth Amendment, Plaintiff has no available remedy.[4]

---

[4] As a result of its analysis as to the *Bivens* claim, the Court need not reach Defendants' arguments as to qualified immunity.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted and Plaintiff's cross-motion for summary judgment is denied.  To be clear—the Court is troubled by the failure to provide needed, emergent medical care to a prisoner entrusted to the BOP's care and recognizes the harshness of this outcome.  Nevertheless, as a district court, the Court is constrained by the recent decisions of the Supreme Court.  An appropriate Order follows.

Dated:  July 24, 2024

/s/ Christine P. O'Hearn
**Christine P. O'Hearn**
**United States District Judge**